IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Lisa Champion, | ) | C/A No.: 0:06-1548-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| vs. | ) | FINDINGS OF FACT |
| | ) | AND |
| Black & Decker (U.S.) Inc., | ) | CONCLUSIONS OF LAW |
| The Black & Decker Disability Plan, | ) | |
| and The Black & Decker Life Insurance | ) | |
| Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Lisa Champion ("Champion"), seeks a determination that Defendant The Black & Decker Disability Plan ("Plan"), abused its discretion when it discontinued her long-term disability ("LTD") benefits. The discontinuation of benefits was based, predominantly, on a limitation on the duration of benefits applicable to "mental health" disabilities. This limitation applies after a period of twenty-four months of LTD benefits and thirty months total combined (short-term disability ("STD") and LTD) benefits.

The Plan is an employee welfare benefit plan as that term is defined by ERISA, 29 U.S.C. § 1132(d)(1), et seq. It is sponsored and self-funded by Champion's former employer, Defendant Black & Decker (U.S.), Inc. ("Plan Sponsor"). Another named Defendant, The Black & Decker Life Insurance Plan, was previously dismissed without prejudice. Dkt No. 21.

The matter is currently before the court for a determination on the merits based on the parties' written submissions. *See* Dkt No. 22 ¶ 8 (joint stipulation agreeing to disposition on the written record). The parties have stipulated to the record which is filed at Dkt No. 22 and is referred to herein by bates numbered pages (*e.g.*, BDK 1). The parties have also stipulated that Plaintiff

exhausted all plan remedies prior to bringing this lawsuit. Dkt No. 22 at ¶ 2.

The parties filed cross-memoranda in support of judgment on November 17, 2006. Dkt No. 23-25 (Defendant) & 26 (Plaintiff). The parties also filed responsive memoranda on December 5, 2006, Dkt No. 28 (Defendant) and 30 (Plaintiff), and supplemental memoranda on February 1, 2007, addressing specific issues raised by the court Dkt No. 32 (Defendant) and 33 (Plaintiff). All memoranda rely on the evidentiary record filed as an attachment to Dkt No. 22.

Plaintiff also filed a related motion to strike the affidavit of Raymond J. Brusca ("Brusca Affidavit"). Dkt No. 29. The Brusca Affidavit was filed for the purpose of submitting Defendant Black & Decker (U.S.) Inc.'s annual statement. This information is relevant, if at all, to a determination of the proper standard of review.

For the reasons set forth below, the court finds that the Plan abused its discretion in discontinuing Plaintiff's benefits because it did so based on an impermissible interpretation of the Plan language and without adequately addressing the Plan's definition of mental health disability. The record is not, however, so clear as to support an award of benefits in favor of Plaintiff when the Plan is properly interpreted and applied. Moreover, the court finds no improper motivation or bad faith on the part of the Plan. The court, therefore, remands the matter for further consideration under procedures set forth at the conclusion of this order.

## APPLICABLE LAW AND STANDARD OF REVIEW

It is undisputed that the benefits at issue are provided under an employee benefit plan governed by the Employee Retirement Income and Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Champion's claim for benefits is, therefore, pursued solely under 29 U.S.C. § 1132(a)(1)(B).

2

It is also undisputed that the Plan's benefits determination is subject to an abuse of discretion standard of review, although there is a dispute as to whether that standard should be modified due to a conflict of interest. Under the abuse of discretion standard of review, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).

Numerous factors are considered in "determining the reasonableness of a fiduciary's discretionary decision." *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001). These include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.*

As these criteria reveal, the plan language is the starting point. *Id.* ("[a]s with any interpretation of a contractual trust document, we begin by examining the language of the Plan"). This is because "ERISA demands adherence to the clear language of the employee benefit plan." *White v. Provident Life Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997). "When an ERISA plan vests discretion in an administrator who also insures the plan, reasonable exercise of that discretion

3

requires that the administrator construe plan ambiguities against the party who drafted the plan." . *Carolina Care Plan, Inc., v. McKenzie*, 467 F.3d 383, 389 (4th Cir. 2006).

As the eighth factor in *Booth* reveals, the court may reduce its deference as necessary to balance any conflict of interest under which the Plan may be operating. *See Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 55 (4th Cir. 1995) (holding that court which finds conflict should modify the standard to the extent necessary to neutralize any untoward influence and, should ultimately, determine whether a fiduciary, acting free from a conflict, would have been reasonable in making the same decision). Here, Plaintiff argues that a reduction in the degree of deference is appropriate because the Plan is self-funded and the total amount of benefits avoided by the discontinuation of benefits is substantial. *See* Dkt No. 26 at 9-11. Defendant, by contrast, argues that the amount at issue is insubstantial relative to the Plan Sponsor's total assets and income. Dkt No. 25 at 8-11. It is as to this issue that Defendant has proffered the Brusca Affidavit.

The Fourth Circuit Court of Appeals recently addressed the proper standard of review to be applied to a self-funded plan in *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170 (4th Cir. 2005).[1] Recognizing that an employer-plan sponsor has a greater diversity of interests than a mere insurer of a plan, the *Colucci* court held that the mere fact that a plan is self-funded does not support application of a modified abuse of discretion standard of review. This conclusion was reaffirmed in *Donovan v. Eaton Corp., Long Term Disability Plan*, in which the court explained the *Colucci* decision as having "determined that a conflict of interest, in which a plan's administrator is also its funder, should not cause the court to reduce deference to the administrator." *Donovan*, 462 F.3d 321, 326 (4th Cir. 2006).

---

[1] Only Defendant refers to the *Colucci* opinion, and not for this particular point.

4

Plaintiff has suggested no facts which would take this case beyond the rule set down in *Colucci*. For these reasons, the court declines to apply a modified abuse of discretion standard of review, even without consideration of the Plan Sponsor's financial statements. This conclusion moots the motion to strike.[2]

## DECISION OF THE COURT

After examining the administrative record, joint stipulation, and parties' memoranda, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

**A.    RELEVANT PLAN TERMS**

The parties have stipulated that certain Plan terms are relevant. *See* Dkt No. 22 at 2-5 (Joint Stipulation). These provisions are set forth below.[3]

---

[2] Were the court to reach the motion to strike, it would be inclined to agree with Defendant that the underlying materials (annual financial statements) should be considered even though they are not part of the administrative record. This is because the materials offered do not relate directly to Plaintiff's claim or seek to modify or explain the factual record on which the benefits decision was based. Instead, they relate only to the ancillary issue of the appropriate standard of review. Moreover, Defendant gave fair notice of its intent to rely on the proffered materials to the extent the standard of review was in dispute. *See* Dkt No. 31 n.1. Finally, the type materials at issue are likely subject to consideration under the judicial-notice doctrine. *See, e.g.,* Fed. R. Evid. 201(b). If considered, the proffered materials would support application of an unmodified abuse of discretion standard of review because the amount to be paid is quite small in relation to the Plan Sponsor's overall revenues.

[3] Plaintiff alleges and the court agrees that there is a conflict between the Plan language and the language in the summary plan description ("SPD"). However, this conflict is such that the SPD is *more* restrictive than the Plan. Therefore, Plaintiff would not be benefitted by the rule addressed in *Aiken v. Policy Management Systems Corp.*, 13 F.3d 138, 141 (4th Cir. 1993). Neither has Plaintiff shown facts which would satisfy the standards set forth in *Aiken* (and related cases) for

Section 6.01 <u>Disability</u> – Subject to the provisions of 6.02 and based on submission of required medical documentation . . . , "Disability" shall mean the complete inability (whether physical and/or mental) of a Participant to engage in his regular occupation with the Employer (during the first 30 months of Disability), and beginning with the thirty-first month of Disability, the Participant's complete inability (whether physical and /or mental) to engage in any gainful occupation or employment with any employer for which the Employee is, as of his Disability Date, reasonably qualified by education, experience or training. . . .

BDK 8 (Plan § 6.01).[4]

The above section is followed by provisions explaining when benefits will end. The following provisions are relevant in this case:

Section 6.04. *Termination of Disability Benefits* – Once commenced under Section 6.03, Disability Benefits shall continue until the earliest of the following events shall occur:

* * *

(F) *After thirty months of Disability (twenty-four months of Long-Term Disability payments) for any Disability that is initially attributable to a Mental Health* . . . Disability, and even if a non-Mental Health . . . Disability diagnosis should develop during the twenty-four month Long-Term Disability period. *For a Disabled Participant with a Disability originally based on a non-Mental Health . . . Disability Diagnosis*, *said Long Term Disability benefits shall cease immediately upon the classification of the Disability as a Mental Health . . . Disability.*

* * *

(L) *The Participant is released to light duty work* with the Employer by their attending physician, an independent medical examiner or other qualified professional,

applying language found in the SPD rather than the Plan itself. The court, therefore, applies only the Plan provisions in resolving this dispute.

[4] This section of the Plan also contains some of the language which supports application of an abuse of discretion standard of review. *Id.* ("The determination of Disability shall be made by the Plan manager based on suitable medical evidence and a review of the Participant's prior employment history *that the Plan Manager deems satisfactory in its sole and absolute discretion*."– emphasis added).

regardless of whether the Employer has light duty work suitable for the Participant.

BDK 10-13 (Plan § 6.04 (F) & (L) – emphasis added).

In addition, Plaintiff maintains, and the court agrees,[5] that it should consider the Plan's definition of "Mental Health Disability":

> "Mental Health Disability" is defined as follows:
>
> Section 2.23 A _Mental Health_ or Substance Abuse _Disability_ shall mean _any mental or psychological disorder with a primary diagnosis in the range of 290 to 319 under the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM)_ promulgated by the World Health Organization. Such mental disorders include organic psychotic conditions and other psychoses, neurotic disorders, personality disorders and other non-psychotic mental disorders, _regardless of underlying cause for such disorder, whether such underlying cause is mental health, substance abuse, organic physical or medical in origin_.

BDK 4 (Plan § 2.23 – emphasis added).

## B.    HISTORY OF THE CLAIM AND MEDICAL EVIDENCE

**Employment pre disability.**  Plaintiff was employed by Black & Decker from August 14, 1995, to November 2, 2004, at its Fort Mill Distribution Center ("Center").[6]  The Center employs approximately 500 people.  Comp. ¶ 4; Answer ¶ 4.

It is undisputed that Plaintiff's job duties, as of her last day worked, required her to operate a motor vehicle.  _See_, _e.g._, BDK 384 (June 19, 2002 letter from employer stating "Your position at Black & Decker involves operating a motor vehicle").

As an employee, Plaintiff was enrolled in the Black & Decker employee group welfare benefit plans effective August 14, 1995.  She continued to be enrolled until Black & Decker

---

[5]  _See infra_ Conclusions of Law § 2.B. n. 28.

[6]  During much of the last two years of her employment, Plaintiff was on disability benefits. Her actual last day worked was either in late 2002 or early 2003.

discontinued her disability benefits which had the effect of also terminating her employment. Comp. ¶ 5; Answer ¶ 5.

**Medical impairments as of initial award of disability**. Plaintiff asserts that she has suffered from epilepsy since 1984. *See* Dkt No. 26 at 2 (stating "Plaintiff first began experiencing epileptic seizures [in 1984 which] doctors initially diagnosed . . . as strokes."). The medical evidence does not appear to support such an early onset date.[7] Nonetheless, it does appear Plaintiff was diagnosed with a "complex partial seizure disorder" in 1999 based, in part, on hospital studies showing "epileptiform activity in the left temporal region." *See* BDK629 (record of March 23, 1999 visit to James H. Pugh, M.D., who diagnosed "complex partial seizure disorder").[8] *See also* BDK 294 (CIGNA record summarizing April 1, 2002 conversation with a medical provider, apparently Plaintiff's primary physician, Phillip A. Hanrahan, M.D., who indicated Plaintiff was "diagnosed w[ith] seizures 1-2 years ago").[9] Plaintiff did, in any case, report seizures or seizure-like events prior to 1998. *See* BDK 629 (Dr. Pugh records); BDK 340 (record of January 27, 1999 visit to Dr.

---

[7] In support of her claim of such an early onset, Plaintiff cites her own letter dated September 25, 2004 (BDK 415-420), and her own reports of seizures dating back to 1984 (BDK 520-522). *See also* BDK 368-74 & BDK 393-97(Plaintiff June 2002 letter appealing a denial of her earlier claim for benefits); BDK 439-440 (Plaintiff June 12, 2005, letter written to support appeal of discontinuance of benefits). To the extent any medical record states such an early onset date, it is only in repeating information obtained from unidentified sources (possibly Plaintiff herself). *See, e.g.,* BDK 375 (letter from Dennis M. Gettelfinger, M.D., stating "*It is reported* that [Ms. Champion] has had epileptic seizures since 1984," but not providing the source of the reports–emphasis added);

[8] Dr. Pugh's records were apparently first obtained by or provided to the Plan during the final appeal. *See* Dkt No. 596 & 620-42.

[9] Another physician who later treated Plaintiff's seizure condition relied on the diagnoses of others as to any pre 2001 diagnosis. *See* BDK 448-50 (June 4, 2001 letter from Dr. Gettelfinger to Dr. Hanrahan stating "This patient appears to have a well established diagnosis of partial complex epilepsy, sometimes with secondary generalization.").

Hanrahan stating that Plaintiff was seen as "follow-up on recent episodes of seizures").

Dr. Pugh's records suggest that Plaintiff's actual epileptic seizures were of the *petite mal* variety. *See* BDK 622-29 (Dr. Pugh records from March 1999 through October 2000 describing Plaintiff's seizures as involving a state of "altered consciousness" and being "well controlled" when Plaintiff was compliant with her medications). At one point, Dr. Hanrahan indicated that he understood Plaintiff had been diagnosed by Dr. Pugh with "grand mal and also petite mal type seizures." BDK 338. No such actual diagnosis is, however, supported by Dr. Pugh's records or the records of any other provider who evaluated the degree of Plaintiff's epilepsy.

Further, both Dr. Pugh and Dr. Hanrahan noted that Plaintiff reported seizure-like events which were not epileptic seizures. BDK 623 (Dr. Pugh's record from September 1999 stating "from [Plaintiff's] description, I am not certain that she has had any definite seizures"); Dkt 340 (Dr. Hanrahan record from early 1999 expressing doubts as to whether the seizures were true seizures or pseudoseizures). *See also* Dkt No. 343 (similar conclusion reached in January 1998 by another provider in Dr. Hanrahan's office who noted that Plaintiff "has had a thorough evaluation by a neurologist [and] is not felt to have a problem with seizures and in fact is felt to have panic disorder. She has seen a psychiatrist in the past but she was unhappy with the treatment that the psychiatrist recommended."); BDK 345-47 & 349-53 (earlier records from Dr. Hanrahan's medical practice indicating Plaintiff was diagnosed with anxiety and depression and noting concerns that she might suffer post-traumatic stress disorder).

Both Drs. Pugh and Hanrahan also reported that Plaintiff's seizures were well controlled with

medication at least into 1999 and 2000.[10]   Indeed, in April 1999, Dr. Pugh cleared Plaintiff to return

to work, despite her diagnosis and "one [recent] brief spell of altered consciousness."  He did,

however, restrict her from driving, operating dangerous machinery or climbing ladders.  BDK 628

& 630.

    In September 1999, Dr. Pugh indicated Plaintiff was reporting some seizure-like events, but

that he did not believe these were "definite seizures."  He listed her diagnosis as "complex partial

seizure disorder, apparently well controlled on" her prescribed medication.  A year later, Dr. Pugh

indicated Plaintiff reported some "intermittent seizures during the last year despite medication" but

questioned her degree of compliance with the medications.  BDK 622.

    By contrast, in May 2002, Dr. Gettelfinger wrote a letter "To Whom it May Concern," in

which he described Plaintiff as suffering from "uncontrolled epilepsy."  *See* BDK 375.[11]  Even long

after this date, however, Dr. Gettelfinger declined to attribute all of Plaintiff's seizures to epilepsy.

Indeed, in March 12, 2004, Dr. Gettelfinger wrote Plaintiff's primary physician stating Plaintiff

"continues to have spells, the dilemma is which of them are epilepsy and which of them are

---

[10]  BDK 332 (Dr. Hanrahan's record of a February 17, 2000 visit indicating Dr. Pugh had increased Plaintiff's dosage of Tegretol "and the seizures seem to have stopped"); BDK 330 (Dr. Hanrahan's record of a March 9, 2000 office visit listing "Seizure disorder/epilepsy" among Plaintiff's diagnoses and indicating she is being treated by Dr. Pugh for this disorder); BDK 328 (Dr. Hanrahan's record of an October 16, 2006 office visit wherein he lists "Seizure disorder/epilepsy, stable" among Plaintiff's diagnoses).

[11]  Certain comments in the letter suggest it was written in support of a Social Security disability claim.  For instance, it concludes by stating: "Due to her uncontrolled epilepsy, I do not believe that she is qualified for gainful employment. . . . I recommend that she apply for Social Security disability in this regard."  The letter also states that it is "not safe for [Ms. Champion] to pursue her usually [sic] employment *and as a matter of fact she is taking medical retirement from her employer.*"  BDK 375 (emphasis added).  The last statement is incorrect, even if interpreted as addressing disability benefits, given that Plaintiff's claim for short-term disability benefits had been denied at the time the letter was written and that denial had not yet been appealed.

pseudoseizures related to anxiety and depression..  I really don't think we will ever be able to sort this out . . . ."  BDK 538

Dr. Gettelfinger's diagnosis, in any case, relies on studies conducted in March 2002 by the Medical University of Georgia in Augusta.  Those reports concluded that Plaintiff suffered from both epilepsy and pseudoseizures.  *See* BDK 615 (March 5, 2002 report signed by Don W. King, M.D., concluding "Our impression is that Ms. Champion has complex partial seizures with secondary generalization which are intractable.  The subjective decreased sensation on the right side is of uncertain mechanism); BDK 617 (April 12, 2002 report signed by Anthony Murro, M.D. diagnosing "(1) Epilepsy, partial with impairment of consciousness, intractable (345.41) and (2) non-epileptic events (pseudoseizure, 780.39)"); BDK 446 (Dr. Gettelfinger's September 5, 2002 letter discussing test results).

Thus, while Plaintiff does have a diagnosis of epilepsy, she also has difficulties with a psychological component, including pseudoseizures.  *See* BDK 446 (Dr. Gettelfinger's September 5, 2002 letter referring Plaintiff for a psychiatric consultation and stating: "It is recommended by the epilepsy clinic in August that she have psychiatric follow up.  She does have a long history of psychological difficulties . . . . I would very [much] appreciate your evaluation and management of this patient's psychiatric situation.");  BDK 538 (Dr. Gettelfinger's March 12, 2004 letter, quoted *supra*).

The evidence also supports the conclusion that the "seizures" which appeared to be the more severe (and which have been described by Plaintiff as grand mal epileptic seizures) were, in fact, pseudoseizures rather than epileptic seizures.  BDK 617 (University of Georgia report stating that Ms. Champion "had multiple non-epileptic events recorded with bilateral asynchronous limb

movements and head rolling from side to side.  She also had a single brief complex partial seizure with left temporal lobe onset.  During the complex partial seizure, she sat and stared.").[12]  To the extent diagnosis codes were assigned to the pseudoseizures by any contemporaneous records, they do not appear to fall within the limited range covered by the  Plan's "mental health" disability definition.[13]

Despite her seizures, Plaintiff continued to work, apparently with some accommodations by her employer (and covering of her difficulties by her co-workers) until January 31, 2002.  *See generally* BDK 514 (employer letter dated March 11, 2002).  On January 31, 2002, Plaintiff experienced a serious seizure (or pseudoseizure) while at work which required emergency medical response and emergency room treatment.  *Id.* She was sent home after this seizure, which was, according to what she reported to Dr. Hanrahan, her first in sometime.[14]

Although the seizure/pseudoseizure disorder was the main reason given for Plaintiff's absence from work, it is also apparent that she was suffering some other problems during the same time frame which would fall within the relevant range.[15]  For example, Dr. Hanrahan included "mild

---

[12]  Dr. King's March 5, 2002 report indicates that he advised Plaintiff of "the risks of driving with epilepsy and . . . not to drive at all until her seizures come under control."  BDK 615.

[13]  As noted, the pseudoseizures were assigned a diagnosis code of 780.39 in these records. This does not fall within the numbers covered by the Plan's "mental health" definition (covering ICD-9-CM code range 290-319).

[14]  Plaintiff reported this seizure to Dr. Hanrahan on February 7, 2002, when she went in for refills of her prescriptions.  *See* BDK 312 (noting that Plaintiff  reported having "a seizure last Friday, " but that "[s]he hasn't really had a seizure in about six months."  *Id.*

[15]  *See* Dkt No. 32 (Defendant's supplemental submission indicating various diagnoses given Plaintiff over the years including for anxiety and anxiety attacks (ICD-9-CM code 300.00), depression ((ICD-9-CM code 298.0), panic disorder (ICD-9-CM code 300.01), post traumatic stress disorder (ICD-9-CM code 309.81), and depression disorder (ICD-9-CM code 311.00).

depression, stable" among Plaintiff's diagnoses in his record of Plaintiff's February 2002 visit.  BDK

312.  He saw Plaintiff again on March 1, 2002 and, at that time, "put her off work for the next two

weeks or so."  He again determined she "need[ed] more time off work" on March 15, 2002, noting,

at that time, that Plaintiff had been to Augusta, Georgia for evaluation, and was set to see a

psychiatrist on March 25, 2002.  BDK 317.  Dr. Hanrahan  indicated his own view, at the time, that

Plaintiff's "mild depression" was "getting somewhat worse." *Id.*

Thereafter, Black & Decker wrote advising Plaintiff that she could not return to work unless

she had her doctor's clearance, a "fitness for duty" examination by the Company Physician, and a

report to the South Carolina Department of Motor Vehicles ("DMV") advising them of her seizure.

BDK 514 (noting that DMV "requires that all licensed drivers must be seizure free for a period of

6 months in order to maintain a valid driver's license.").   This letter did not find Plaintiff to be

unable to perform her occupation, despite her inability to drive.  Rather, it only required that she

provide proof that she had given DMV a report.[16]

**Short term disability application.**  Plaintiff applied for short-term disability benefits in

early March 2002.  *See generally*  BDK 270-75 (record of initial claim to third-party claims

administrator CIGNA Integrated Care ("CIGNA")) .  The claim was initially denied by CIGNA by

letter dated April 30, 2002.  BDK 360-61.

In its notes regarding the reasons for the initial denial, CIGNA accepted that Plaintiff suffered

from epilepsy with established seizures twice a month, as well as employee-reported pseudoseizures

of an unknown nature.  BDK 311 (noting Plaintiff described the true seizures as grand mal).  CIGNA

---

[16] This suggests that accommodations, including elimination of the driving duties, had been
or would be made.

concluded, nonetheless, that these were conditions with which Plaintiff had been able to work in the past and there was "no change of medical condition found to cause need to suddenly be off work." *Id.*  *See generally*  BDK 270-275 (CIGNA intake form indicating "Employee was taken off work and put on FMLA by her PCP on 03-02-2002 due to epilepsy, stress and anxiety.").

Acting on her own behalf, Plaintiff appealed the denial by handwritten letter which Plan representatives received on or about June 3, 2002.  *See* BDK 367 (e-mail referring to receipt of letter from Plaintiff and physician); BDK 368-74 (Plaintiff's handwritten letter); BDK 375 (May 30, 2002 letter from Dr. Gettelfinger).  In her letter, Plaintiff claimed a degree of seizure severity which does not appear to be supported by any medical documentation.[17] She also claimed to drive frequent long distances, contrary to her claim of frequent severe seizures and prior advice not to drive until cleared.  BDK 370-71 (claiming she drives 96 miles to work each day despite frequently experiencing serious spells in which she loses control and awareness).

A series of e-mails between and among CIGNA and internal Plan representatives followed between June 3, 2002, and June 10, 2002.  BDK 376-78.  This string, and a forwarded CIGNA summary, reflect that internal Plan representatives were inclined to view the claim more favorably than did CIGNA.  *Id.*; BDK379-83 (CIGNA summary).

The Plan acknowledged receipt of Plaintiff's appeal by letter dated June 19, 2002.  BDK 384. This letter inquired both about evidence that Plaintiff was still driving her private vehicle while seeking disability for seizures, and whether she was being treated for any other medical conditions.

---

[17]  For example, Plaintiff asserts that, during the January 2002 seizure at work, her heart stopped and she ceased breathing.  She asserts that she began breathing and her heart began beating again spontaneously.  BDK 369.  These are matters which, necessarily, she would need to have learned from third-party observers.  No third-party evidence is, however, offered to suggest this level of severity.

It asked that supporting materials be submitted by July 10, 2002.

Plaintiff responded by letter postmarked July 8, 2002, conceding she had driven at least once when she should not have been driving but explaining that she did so out of a need to refill a prescription. BDK 385-88. The remainder of this letter addressed Plaintiff's financial concerns and explained that her car had since been repossessed (thus ending the risk of driving), but did not address her medical conditions. *Id.* The only attachments related to the repossession of the car. BDK 389-90.

In a July 10, 2002 e-mail to other Plan representatives, Plan representative Raymond Brusca stated that, in his opinion, Plaintiff had "satisfactorily explain[ed] the use of the car[.]" He also noted that Plaintiff did not indicate "if she is seeing a mental health therapist," and noted that the Plan could not get this information without her permission. He concluded:

> All of this basically leads us back to where we were in the beginning. Yes, she has a seizure disorder that is hard to control. Documentation only reflects 1-2 real seizures a month. *The other "seizures" apparently are panic attacks over having seizures. The question is, to qualify as a medical disability, we just do not have evidence to approve a disability claim. I am comfortable approving a mental health claim on an interim basis pending receipt from her of a report from her therapist .* . . . As a mental health claim it will be limited to 30 months total disability (assuming ongoing documentation supports an ongoing claim). Bill and Elaine; if you are OK I will have CIGNA approve the STD benefits . . . and any LTD benefits will not be paid until we receive adequate support from her therapist.

BDK 401 (emphasis added). Another Plan representative, Bill Bruner, responded that the decision was Brusca's and that he (Bruner), agreed that "[e]ven the mental disability claim is weak, until she provides a report from her therapist." BDK 404.

Shortly thereafter, the Plan received a letter from Brenda L. Eshbach, MA, LPC, addressing Plaintiff's mental health status. BDK 402-03. This letter explained that Eshbach had seen Plaintiff

15

four times in May and June of 2002. She repeated Plaintiff's self-reports of an emotionally and physically abusive history, seizures ("seemingly from head trauma during physical abuse") since the age of 21, pseudoseizures, panic attacks, and a "'nervous breakdown' in 1984/85.'" The counselor stated that pseudoseizures can "develop secondary to past traumas," but did not expressly address whether they would be considered a mental health issue (much less the specific diagnosis code).

The counselor also stated that Plaintiff's attacks were diagnosed as anxiety attacks "up until [five] years ago, when accurately diagnosed as seizures and pseudo-seizures by Dr. Pew [sic], a Neurologist." She concluded with the following statement:

> [Ms. Champion] has recently had more of these episodes at work. One of her recent pseudo-seizures was Sunday, May 12, 2002. It took ab[out] a day of rest to recover. Oftentimes it takes longer. Her most recent symptoms are unpredictable seizures and pseudo-seizures, depression (crying spells, loss of interest in things previously enjoyed, difficulty concentrating, grief [about] loss of ability to function and hold a job).

BDK 403.[18]

Conceding the claim presented a "tough" question, the Plan decided, on July 15, 2002, to reverse the denial and award short-term disability benefits. In doing so, the decisionmakers noted that Plaintiff was "having on[e] true seizure per month" which had caused her to lose her license and, therefore, her ability to "do her job which involves driving." BDK 409. They also acknowledged that Champion was "having panic attacks and pseudo-seizures–clearly a mental health condition." Nothing in these notes, however, suggests that the decisionmakers considered or applied the Plan definition of "mental health disability," with its limited range of relevant diagnosis codes, in

---

[18] There is no evidence to suggest that the counselor obtained the information regarding Plaintiff's diagnoses directly from Dr. Pugh. The misspelling of Dr. Pugh's name suggests that she did not. In any case, Ms. Eshbach would not, herself, be qualified to offer a diagnosis or opinion except as to Plaintiff's psychological difficulties.

16

forming this opinion.

The Plan's ultimate decision to grant STD benefits was summarized as follows:

> Approve benefits based on mental health retro to her last day worked. Continue these, on an interim basis, thru August 31. Advise her that these have been approved but will end on August 31 if she is not in regular, weekly therapy at that time . . . . [noting that with a retroactive award, she would have money for cabs and co-pays]. If she is not in active treatment by 8/31 all benefits will end and CIGNA will send her a new benefit termination letter for failure to be engaged in active treatment as required by the Plan. . . . [O]nce we have several months of notes from her therapist, Sandy at CIGNA can then make a more thorough evaluation to see if her underlying mental health condition is sufficient to justify ongoing STD benefits. Sandy, outline all this in a letter to Lisa with a copy to me and Elaine Long at Ft. Mill. Elaine, once you receive a copy you should talk to Lisa and make sure she understands that she must get in weekly therapy now or the benefits will be cut off once again.

BDK 409.

The record before the court does not reveal whether the letter mentioned in the above note was sent to Plaintiff. Thus, it is unclear whether Plaintiff was given notice at the time of the award that the Plan had awarded benefits solely based on the mental health disability definition with its corresponding limitation on the duration of benefits. Neither is there other evidence of what occurred during most of the two years between when benefits were awarded and when they were terminated. It does, however, appear that the short-term benefits converted to LTD benefits on or about August 30, 2002, and that disability benefits were paid continuously through the thirtieth month of combined STD and LTD benefits. BDK 275, 0410-414.

In April 2004, several months prior to the anticipated termination of benefits, the Plan informed Plaintiff that it was evaluating whether her LTD benefits should continue past the thirtieth month of combined disability payments. *See* BDK 411 (August 30, 2004 letter referring to letter dated April 22, 2004). The Plan asked Plaintiff to provide (or to sign releases so the Plan could

17

obtain) medical records. It also asked her to complete a Disability Questionnaire. *Id.*

Plaintiff provided her response to the questionnaire in May 2004. BDK 534 (discussed *infra* n. 22). The third-party administrator ("TPA") summarized Plaintiff's responses as stating "that the primary condition preventing [Plaintiff] from working was 'depression and continued seizures'" and also "advis[ing] that [she was] able to drive within a 5 mile radius [of home]." BDK 411. The TPA's summary of medical records indicates that Plaintiff experienced some seizures between December 2002 and June 2003, but that this was because she ran out of medication, and that she reported "no spells or seizures" between June and December 2003. BDK 411.

Dr. Gettelfinger's actual records indicate that, as of March 2004, Plaintiff was "continu[ing] to have spells," but that he was unable to determine "which of them are epilepsy and which of them are pseudo[-]seizures related to anxiety and depression." BDK 412. Records from another physician (Hayne D. McMeekin, M.D., a Psychiatrist), indicate that Plaintiff was being treated for panic attacks during this period. *Id.* Records from Plaintiff's therapist, Faith Northington, likewise, indicate that Plaintiff was being treated for anxiety and occasional panic attacks during the same time frame.

The TPA concluded that Plaintiff was not entitled to continued benefits and, therefore, denied her claim through the August 30, 2004 letter summarized above. The letter stated that Plaintiff's benefits would be discontinued, effective in September 2004, on two grounds. BDK 412-13, First, it noted that the medical records did not support Plaintiff's inability, either due to physical or psychiatric disability, "to perform your occupation or any occupation." Second, it noted that benefits for "a psychiatric illness [are] only payable for 30 months from the date of disability." BDK 412-13. Information as to how to appeal the decision was included with this letter. BDK 413-14.

Plaintiff responded by handwritten letter dated September 25, 2004. BDK 415-420. This

letter addressed Plaintiff's abusive past, which she suggested may have caused some of her difficulties. She also summarized the difficulties she experienced during the last two years of her employment, particularly a seizure which led to her transport to the hospital. She conceded that her "grand malls [sic] have [stopped]."[19] Focusing on her desire to work, she stated: I'm not trying to avoid work. I just can't handle the stress and pressure of the environment anymore. I have to pay a high price mentally and physically." BDK 417.

Plaintiff also stated that she has modified her life because of the seizures or spells, such as no longer bathing or using a stove. *Id.* She then described her "different types of seizures" as including "smelling of burning flesh and a gross rhythm being chanted. I can hear it when I'm alone or it comes through the voices of people in conversation." BDK 418. She explained that when she is experiencing these problems, she "need[s] someone to talk [her] down," and that having paper to hold sometimes calms her. BDK 417-18.

Although not expressly submitted as an appeal, the Plan treated the above letter as such. *See* BDK 422 (Brusca e-mail). In his e-mail addressing Plaintiff's letter, Brusca reminded the other Plan representatives that CIGNA initially denied Plaintiff's disability claim but "[u]pon appeal we reinstated benefits based on what was clearly an unstable mental health condition." He noted that the claim had been "managed as a mental health claim up to [Plaintiff's] 30th month of disability benefits." BDK 422. Referring to Plaintiff's recent letter, he stated: "it is apparent to me that she is still suffering from a disabling mental health condition." He noted, however, that the termination of benefits would be "due to a strict plan 30 month limit." *Id.*

---

[19] As noted above, there are no medical records which diagnose Plaintiff as suffering from grand mal epileptic seizures.

19

An unsigned handwritten note dated October 7, 2004, appears to reflect the deliberations of the Plan committee reviewing Plaintiff's appeal. This note acknowledged that continued benefits were "denied [by the TPA] due to 30 month mental health limit . . . not . . . due to change in condition." BDK 423. It also acknowledged that Plaintiff was "clearly still disabled due to her mental health condition," but that "the plan has a strict limit." Finally, it reflected a decision to deny the appeal. *Id.*

Plaintiff was informed of the denial by letter dated October 7, 2004. BDK 425. This letter advised Plaintiff that her claim and appeal were denied based on the thirty month limitation for mental health disabilities. *Id.*

Nothing further transpired regarding the disability benefits until Plaintiff sent a typed letter to the Plan roughly five months later.[20] BDK 426 (letter dated March 16, 2005). This letter, apparently drafted by counsel, asked that certain information be mailed to a post office box. *Id.* (the post office box corresponds with that of Plaintiff's current attorney).

**Second Appeal.** On April 19, 2005, counsel wrote to the Plan on Plaintiff's behalf asking that Plaintiff's appeal be reopened. BDK 428-29. Counsel conceded that Plaintiff suffered from mental health difficulties but stated that her "primary diagnosis is epileptic seizures." BDK 428. In addition to other materials, counsel sought a copy of the complete administrative record of the claim. BDK 429. The Plan agreed to allow a further appeal. *See* BDK 430 (letter dated May 10, 2005 allowing Plaintiff 30 days to submit additional materials).

---

[20] Black & Decker did, however, terminate Plaintiff's employment (and, consequently, her eligibility for other employee benefits), on or about November 1, 2004. *See* BDK 650 (Plan letter conceding same). This decision was derivative of the decision to discontinue disability benefits.

Plaintiff, through counsel, submitted additional responsive materials by letter dated June 14, 2005. BDK 431-35 (letter); BDK 436-524 (attached supporting materials). In her cover letter in support of the appeal, counsel argued that Plaintiff's disability was caused by a physical problem. BDK 431. She asserted, *inter alia*, that if the seizures were "purely psychological in nature," they would not have been increased by a reduction in seizure medication. BDK 433 (also noting that Plaintiff had been diagnosed as having epilepsy). Counsel also suggested that Plaintiff's history of physical trauma was one cause of her seizures. BDK 433. She attached evidence of Plaintiff's history of domestic violence, head trauma, and epilepsy as well as a number of articles supporting a possible causative connection between traumatic brain injury and later psychological and other difficulties. *See* BDK 433-44 (listing attachments). In addition, counsel challenged the Plan's failure to provide all documents requested, suggesting that the record which had been provided contained significant gaps. BDK 434.

The materials attached to this letter which do not appear to have been previously provided to the Plan included a handwritten statement from Plaintiff dated June 12, 2005, which explained her history of head trauma due, predominantly, to various abusive relationships. BDK 439-40. Counsel also attached records of two office visits with Dr. Hanrahan, both dating from 1996, which indicate Plaintiff's "psychological problems . . . stem from an abusive recent relationship," that she may suffer from "battered women's syndrome," and recommending psychiatric counseling for anxiety. BDK 442-43. Records from Dr. Gettelfinger were also included which discussed the possibility that prior physical abuse and head injuries may have contributed to Plaintiff's various problems. BDK 446-48.

A February 5, 2004 letter from Dr. Gettelfinger to Christine Hernandez of NELnet of Denver

Colorado wjas also included.  This letter stated:

> I am in receipt of your request for additional information regarding Lisa Champion,
> I am rather surprised that you find it necessary to ask for this information, based on
> the fact that in my letter of May 30, 2002, I wrote, in the last paragraph, "It is my
> judgment that she is totally and permanently disabled for purposes of employment.
> It seems to be [sic] that this could not be more clear. However, if, in fact you require
> some other kind of verbiage in this regard, please find it to be of my opinion that this
> patient is not able to work and earn money in any capacity.
>
> I hope you will find this unambiguous.

BDK 445 (repeated at BDK 0539).[21]

Dr. Pugh's records were apparently first provided through this appeal.  In addition, a letter from Dr. Gettelfinger dated September 5, 2005(which would not have been available earlier) referring Plaintiff for a psychiatric evaluation was included.  BDK 446-47. Counsel also provided a list of Plaintiff's medications with these materials.   BDK 453 (listing two antiseizure/ anticonvulsant medications, two medications for anxiety and depression, and one to treat angina and high blood pressure).

The appeal materials also included a letter written in June 2003, by Plaintiff's Psychiatrist, Dr. McMeekin, to Dr. Gettelfinger, addressing management of Plaintiff's medications.   Dr. McMeekin reported that Plaintiff had ceased taking one of her medications, Ativan, for a period of two weeks.  She reported that this medication did help, and that getting off of it made her more anxious.  Se also reported that she had experienced several seizures while off  Ativan.  Dr. McMeekin stated that Plaintiff

---

[21]  It is neither clear what information was requested by Ms. Hernandez, nor whether NELnet is in any way connected with the Plan. The letter does, however, appear to have been included in materials provided by the Plan to Plaintiff as an attachment to a July 7, 2005 letter (BDK 530). Thus, the letter may have originally been directed to an agent of the Plan.  Dr. Gettelfinger's letter is, in any case, entirely too conclusory to be of much (if any) support for Plaintiff's claim.

> appears to have a *secondary structural affective disorder*. She is unable to focus and concentrate. Her mind races. She stays on guard a great deal of the time and is very anxious as a result of that. She also has marked problems with her memory and problems with focusing. She cannot shut her mind off at night to go to sleep. . . . [T]here are two distinct problems here. One is seizure control and the other is control of her glutamate excitability and her secondary continued output of CRF, which activated the fight or flight mechanism and *makes all her psychiatric symptoms come about*.

BDK 510 (emphasis added). Dr. McMeekin also referred to a "bipolar component" of Plaintiff's "affective disorder."

Ultimately, Dr. McMeekin suggested a possible modification of the drugs prescribed to treat Plaintiff's seizure disorder as those might have been interfering with treatment of her psychiatric difficulties. He noted, nonetheless, that "[h]er major concern of course is her seizure disorder," and that Dr. Gettelfinger was the final authority as to that condition. BDK 511. A second, virtually identical letter sent by Dr. McMeekin to Dr. Gettelfinger on December 19, 2002, was also included in the appeal materials sent to the Plan.

The articles included with the appeal letter addressed a possible link between head trauma and both physical and psychiatric difficulties. For example, one article addresses an "emerging hypothesis . . . that mild traumatic brain injury may cause cumulative damage to the brain, which could ultimately result in memory and learning dysfunction." BDK 456. Another addressed "the relationship between acute stress disorder and PTSD over the 2 years following mild traumatic brain injury." BDK 472. *See also* BDK 495-502 (article from a legal journal entitled: "The Significance of Partial Seizure-Like Symptoms Following Mild Traumatic Brain Injury").

Having not yet heard from the Plan as to a decision on the appeal, Plaintiff's counsel wrote again on June 27, 2005. BDK 525. This letter provided a medical record from Plaintiff's May 14, 2003 visit to an emergency room. The underlying record supports the conclusion that Plaintiff

23

suffered a seizure as a result of being without her antiseizure medication for seven days.  BDK 527.

On July 7, 2005, Brusca wrote Plaintiff's counsel advising that the appeal would be sent for an independent medical review.  BDK 530.  He explained that "[a]fter this consultation with a health professional who has training and expertise related to her claim, the Appeals Committee will reconsider Ms. Champion's appeal for continued disability benefits."  He allowed Plaintiff until July 29, 2005 to submit additional materials.

This letter from the Plan also provided other claim-file materials previously considered by the Plan but which may not previously have been provided to Plaintiff or her attorney.  *See, e.g.* Dkt No. 531-34 (Plaintiff's May, 4, 2004 Disability Questionnaire)[22]; BDK 538 (Dr. Gettelfinger letter to Dr. Shealy dated March 12, 2004 (stating that Plaintiff "continues to have spells, the dilemma is which of them are epilepsy and which of them are pseudoseizures related to anxiety and depression")); BDK 539 (Dr. Gettelfinger's February 5, 2004 letter to Hernandez of NELnet); BDK 540 (Dr. Gettelfinger's December 11, 2003 letter stating that Plaintiff reported "no spells or seizures since I saw her in June" and that "Dr. McMeekin [her psychiatrist] is helping her a lot"); BDK 541 (Dr. Gettelfinger's June 23, 2003 letter to Dr. McMeekin stating view that Plaintiff's "seizures are at least in part pseudoseizures related to stress" and agreeing to a medication change); BDK 542 (Dr. Gettelfinger's June 16, 2003 letter to Dr. Shealy (Plaintiff's primary care physician) stating that: Plaintiff "is followed for an epilepsy problem which she has had for many years"; she had taken

---

[22]  On this questionnaire, Plaintiff explained that she could not work because "Pressures and tension of the job causes increase[d] seizures-loss of memory-problem with my speech [and] recall-already causing me problems in functioning independently.  Any more and I can lose the little bite [sic] of freedom I do have.  I went to college and that information is being lost."  BDK 532 (also including other comments regarding types of information being lost).  She listed both "depression" and "seizures" as her disabling conditions but also stated that she drives within a 5 mile radius of home.  *Id.*

medical retirement "because of the refractory seizures";"[s]he has significant psychological issues as you are aware"; and she had "some bad seizures since . . . December," but indicating this was likely due to not having access to her normal medication); BDK 557 (response from Dr. McMeekin indicating he is treating Plaintiff for depression); BDK 558 (McMeekin record also referencing treatment for panic attacks); BDK 561 (November 24, 2003 record reporting "months [without] seizures" but still dealing with depression); BDK 565 (McMeekin record of March 6, 2003 visit in which Plaintiff reported recent grand mal seizure); BDK 566 (McMeekin record of January 20, 2003 visit in which Plaintiff reported "no seizures that she knows about" but has had "spells . . . and panic attack"); BDK 568-70 (Northington (counselor's) August 11, 2004 report to CIGNA indicating Plaintiff reports: "severe memory problems"; "occasional panic attacks when experiencing undue stress"; "any physical or mental strain for prolonged period induces seizures" – diagnosing dysthymia, panic disorder and PTSD); BDK 572-73 (Northington reports from June and July of 2004 reflecting Plaintiff's self-reports of seizures including several described as grand mal seizures); BDK 574 (Northington records from April and May 2004 reflecting Plaintiff's self-reports of "panic attacks or seizures" – also noting Plaintiff had assumed temporary custody of her nephew due to DSS intervention); BDK 575-76 (Northington records from February through March 2004 referring to Plaintiff's memory problems, panic attacks and PTSD symptoms).

On July 27, 2005, Brusca wrote to Plaintiff's counsel indicating the medical reviewers had asked to see the records from the Medical College of Georgia (from the spring of 2002). The reviewer was particularly interested in "the neurosurgeon's report and any objective test results such as EEGs, MRIs, and the record of the video EEG recording that supported the diagnosis." BDK 578.

Counsel responded, indicating she would try to obtain those documents. She also provided several additional exhibits including: a letter from the Social Security Administration evidencing that

25

Plaintiff had previously obtained an injunction against her former husband due to physical abuse; and evidence of an April 2001 hospitalization which counsel described as "for grand mall[sic] seizure witnessed by bystanders."  BDK 579.[23]

The attached letter from the Social Security Administration indicates that Plaintiff's disability file could not be located, but does provide the following basic information:

Date Claim Filed – 06/15/2002
Approved Date of Disability Onset – 02/28/2002
Primary Diagnosis – Epilepsy
Secondary Diagnosis – Affective/Mood Disorders
Date of Initial SSA Entitlement – 08/2002

BDK 582.

On August 10, 2005, Plaintiff's counsel wrote the Plan stating that she had completed her initial evaluation of the claim, and was "convinced that [Plaintiff's] physical condition is the primary cause of her disability . . . ."  BDK 596.  Counsel attached two additional exhibits: the requested treatment records from the Medical College of Georgia; and Dr. Pugh's records from March 5, 1998 through October 30, 2000.

**Medical College of Georgia Records.**  The records from the Medical College of Georgia (BDK 599- 619) reflect review of multiple EEGs.  The reviewing physician, Don King, M.D., characterizes some findings as "consistent with the patient's history of intractable complex partial seizures," but also notes that one episode "characterized by decreased responsiveness, rhythmic jerking of trunk and extremities, and flailing or slapping movements of the extremities," "was

_____

[23]  The underlying record indicates "bystanders state [patient] had seizure lasting several minutes."  BDK 587.  It also states that the witnesses reported "full body involvement."  BDK 588. The record does not, however, diagnose the cause as epilepsy or describe the seizure as grand mal (thereby suggesting epilepsy as cause).

suggestive of a psychogenic event." BDK 599-600. *See also* BDK 603 (noting findings "consistent with the patient's history of epilepsy and non-epilepsy events (pseudoseizures)" ).

The ultimate conclusions from the studies at the Medical College of Georgia are expressed in the report of Anthony Murro, M.D. who states under "History":

> [Ms. Champion] reports episodes of bilateral arm jerking, head movements from right to left and a caving in feeling. These episodes were found to be non-epileptic events on EEG-video monitoring. She also has episodes of a blank stare and unresponsiveness. These episodes were temporal lobe complex partial seizures on EEG-video monitoring.

BDK 606 (also noting that Plaintiff reported "Spells: 3 over the last 6 weeks."). He notes that Plaintiff had one "left temporal lobe onset seizure" and "many pseudoseizures" during the period studied. The ultimate diagnosis was as follows:

> IMPRESSION: Pseudoseizure (780.39). Epilepsy partial with impairment of consciousness (345.41). From her description it is certain that some of her spells are non-epileptic events. I cannot determine how many of her recent spells are epileptic seizures.

BDK 606. *See also* BDK 614-15 ("Assessment: Our impression is that Ms. Champion has complex partial seizures with secondary generalization which are intractable. The subjective decreased sensation on the right side is of uncertain mechanism."); BDK 617 (Discharge summary stating Plaintiff had multiple non-epileptic events recorded with bilateral asynchronous limb movements and head rolling from side to side. She also had a single brief complex partial seizure with left temporal lobe onset. During the partial seizure she sat and stared." )

A psychological study was also performed by the Medical University of Georgia. BDK 608-11. This study found Plaintiff's "general functioning [to be] in the high end of the low average range," and otherwise found her abilities to be in the low average to average range. BDK 611 (signed David W. Loring Ph.D). Dr. Loring concluded Plaintiff was experiencing "mild to moderate

27

amounts of subjective depression." BDK 613. No other personality or emotional disorders were noted.

**Plan-Requested Medical Review.** On July 29, 2005, the Plan wrote to outside medical experts James G. Ebeling, M.D., and A. Allan Genut, M.D., asking them to conduct independent medical reviews of Plaintiff's claim file.[24] The questions they were asked to address were as follows:

1.      Based on the administrative record as of July 15, 2002 (i.e., the medical and/or mental health documentation for care and services rendered up to and including July 15, 2002):

>     a.      Was Ms. Champion disabled based on a medical condition (specifically epilepsy or any other medical, as opposed to mental health, condition supported by the documentation). Identify the specific medical condition and what documentation has lead you to this conclusion.

>     b.      If a medical condition (specifically epilepsy or any other non-mental health condition that you identify based on the documentation in the file) would that medical condition have prevented her from completely performing:

>>          i.      Her regular occupation? Her regular occupation was as a Yard Coordinator which involved operating a motor vehicle (fork lift).

>>          ii.      Any full-time light duty position?

2.      If you answered "yes" to (1)(b)(i) or (1)(b)(ii), was she able to perform any gainful job for which she is reasonably qualified by education, experience, or training, based on the administrative record as of October 7, 2004 . . . . For this question, disregard documentation of any care rendered after October 7, 2004. . . . .

3.      Based on the administrative record as of July 15, 2002:

>     a.      Did Ms. Champion have a mental health disability? *Under the terms of the Plan, a mental health disability is defined as any mental or psychological disorder with a primary diagnosis in the range of 290 to 319 under the International Classification of Diseases, 9th Revision, Clinical*

---

[24] According to the Plan's final denial letter, Dr. Ebeling is a specialist in internal medicine while Dr. Genut is a specialist in neurology.

*Modification (ICD-9-CM) promulgated by the World Health Organization.*
Such mental disorders include organic psychotic conditions and other
psychoses, neurotic disorders, personality disorders and other non-psychotic
mental disorders, regardless of underlying cause for such disorder, whether
such underlying cause is mental health, substance abuse, organic, physical,
or medical in origin.

    b.     If so, would that mental health disability have prevented her from
completely performing:

        i.       Her regular occupation? . . . .

        ii.      Any full-time light duty position?

BDK 664 (emphasis added).

**Dr. Ebeling Report.** In his August 12, 2005 report, Dr. Ebeling concluded that Plaintiff was

not "totally disabled on the basis of a medical condition, specifically a seizure disorder" as of July

15, 2002. BDK 645. He acknowledged, nonetheless, that the record "support[ed] the presence of

a complex partial seizure disorder with occasional genuine seizures" which "could prevent her from

performing her regular job as a Yard Coordinator." BDK 646. He opined, however, that this "would

not prevent her from performing any full-time light duty position which does not involve climbing

ladders or operating dangerous machinery." *Id.*

Dr. Eberling reached the same conclusion when considering the record as of October 7, 2004.

BDK 646. As to this time period, he specifically referred to records from McMeekin and

Northington repeating Plaintiff's reports of minimal, if any, seizures or spells in the several months

preceding her January and November 2003 visits, and Dr. Gettelfinger's statement that Plaintiff

reported no seizures between June and December 2003.

Turning to Plaintiff's psychological difficulties, Dr. Eberling concluded that Plaintiff suffered

from pseudoseizures, depression and probable panic disorders as of July 15, 2002. BDK 646. He

further concluded that "[t]hese illnesses appear to have prevented her from performing her regular

occupation or any full-time light duty position" at that time.  BDK 646.

**Dr. Genut's Report.**  Dr. Genut, a Neurologist, submitted his report on August 19, 2005. He noted that "EEG video monitoring is the most definitive test available for differentiating seizure from pseudoseizure."  BDK 649. Reviewing Plaintiff's EEG-video study, he concluded (as apparently did the earlier reviewers at the Medical University of Georgia) that "four of the five events that she had were confirmed as pseudoseizures."  He defined "pseudoseizures" as "non-physiologic events of psychiatric origin, almost always associated with severe psychiatric issues" and "never the result of physical or structural damage to the brain."  *Id.*  He also stated that "multiple closed head trauma . . . is unlikely to be the cause of [Plaintiff's] temporal lobe seizures."  *Id.*

He noted that "[n]o work restrictions are necessary in patients with pseudoseizures.  Patients with organic temporal lobe seizures are restricted from operating motorized vehicles, heavy machinery and working at unprotected heights."  *Id.*

Based on the above, he concluded that Plaintiff "is not able to perform the duties of her regular occupation as a yard coordinator."  He concluded, however, that she is "*physically* fit for any and every type of employment, provided the above restrictions are in place.  This would include a full-time light duty position."  *Id.*   This conclusion, which is expressly based solely on evaluation of non-mental disorders, was stated as effective both prior to and after October 7, 2004.  BDK 649 (stating that opinion regarding fitness was "based on medical (and not mental) documentation").

**Mental Health Definition.**  Only Dr. Eberling expressly addressed the impact of Plaintiff's mental health difficulties, although Dr. Genut expressly excluded them from consideration in determining whether Plaintiff was "physically" disabled.  Neither doctor, however, provided any reference to diagnosis codes in explaining his opinion, despite the inclusion of the relevant definition in the Plan's letter to the doctors.

**Final Appeal Meeting.** By letter dated August 22, 2005, Brusca informed Plaintiff's counsel that the Appeals Committee would meet on August 30, 2005. The letter does not appear to provide Plaintiff with a copy of the Eberling or Genut reports. It does not, therefore, appear that she was given an opportunity to comment on them.

**Final Denial.** The appeal was denied by letter dated September 1, 2005. The letter noted that Plaintiff received a total of thirty months of combined STD and LTD benefits. BDK 659. It also stated that the original approval was based on a mental health diagnosis and was, therefore, subject to the thirty month limitation of Plan § 6.04(F). BDK 660.

The letter also stated that, in reviewing the present appeal, the Plan reconsidered whether the initial approval should have been based on the mental health rather than other medical disability determination. As to this provision, the denial letter stated:

> At the time of Ms. Champion's initial claim, CIGNA determined that Ms. Champion's disability was not due to her epilepsy since her seizures were infrequent and she could physically perform light duty work, although not her specific job since it involved operating a motor vehicle. Under Section 6.04(L) of the Plan a claimant who can perform light duty work is not eligible for continued disability benefits. The Appeals Committee concurred with this decision but found, after reviewing the documents and medical records submitted by or on behalf of Ms. Champion, that she did have a mental health disability and awarded benefits on that basis.

BDK 660.

The letter concluded:

> The Committee continues to find that the record lacked support for a finding of a physical disability as defined under the Plan. From their review of her medical records, both Dr. Eberling and Dr. Genut have concluded that the medical record supports the diagnosis of a seizure disorder but not a conclusion that Ms. Champion's physical condition would have prevented her from performing light duty work.

> For all of the foregoing reasons, it appears that the decision to deny Ms. Champion's claim was appropriate. It is therefore the decision of the Appeals Committee to affirm the denial of the claim and deny Ms. Champion continued disability benefits under The Black and Decker Disability Plan.

31

BDK 661 (adding that Plaintiff had exhausted her appeal rights under the Plan and explaining her

further rights to obtain documents and seek judicial review).

This litigation followed.

## CONCLUSIONS OF LAW

**1.      Initial Disability.**

The definition applicable to the first twenty-four months of LTD disability benefits and first

thirty months of combined disability benefits is as follows:

> Section 6.01 <u>Disability</u> – Subject to the provisions of 6.02 and based on submission
> of required medical documentation . . . , "Disability shall mean the *complete inability*
> (whether physical and/or mental) of a Participant *to engage in his regular occupation*
> with the Employer (during the first 30 months of Disability) . . .

BDK 8 (emphasis added).

The Plan maintains that Plaintiff met this definition during the first thirty months of disability

only because of her mental health problems.  It, therefore, argues that Plaintiff's total benefits were

properly limited to a thirty month period under Section 6.04(F) of the Plan (discussed *infra*

Conclusions of Law § 2.B.).

The Plan's argument requires the following sequential analysis:  (1) the disability definition

includes a light-duty limitation; (2) but for her mental health problems, Plaintiff could have

performed a light-duty version of her regular occupation; (3) Plaintiff's disability was, therefore,

properly characterized as mental health disability from the outset; and (4) Plaintiff's disability

entitlement is, therefore, limited to a total of thirty months.

**A**.      **Interpretation of Disability Definition.**

The basic difficulty with the Plan's argument is that it requires an interpretation of the Plan's

basic disability definition to include a light-duty limitation.   There is, however, no reference to any

light-duty limitation in the disability definition. Instead, the light-duty reference appears in a provision addressing when benefits will *end*. *See* Plan § 6.04(L). This presupposes that the benefits have already begun.

Moreover, the light-duty limitation comes into play only when specific preconditions are met. Specifically, the relevant provision states that benefits will end when: "The Participant is *released* to light duty work with the Employer *by their attending physician, an independent medical examiner or other qualified professional*, regardless of whether the Employer has light duty work suitable for the Participant." Plan § 6.04(L) (emphasis added).

The inclusion of a separate limitation providing for *cessation* of benefits if and when an employee is *released* to light-duty work runs counter to any interpretation of the basic disability definition to include a light-duty limitation. More critically, the preconditions to invocation of the light-duty limitation ("release" by a medical professional) would be made meaningless if the light-duty limitation were read into the disability definition itself. For both reasons, the court rejects any interpretation of the basic disability definition to include a light-duty limitation.

In reaching this conclusion, the court has assumed that the "complete inability" language found in the disability definition is not, alone, inconsistent with inclusion of a light-duty limitation. The Plan's present interpretation is also consistent with the summary plan description's inclusion of the light-duty limitation in its recitation of the disability definition.[25] Thus, the Plan has apparently been consistent in its interpretation, which would favor allowing the interpretation to stand if it could be reconciled with the plain language of the Plan.

It remains, however, that the Plan's interpretation of the basic disability definition is contrary

---

[25] This is the point on which the SPD is more restrictive than the Plan. *See supra* n. 3.

to the plain language of the Plan. Given the paramount nature of the Plan language, it follows that the Plan abused its discretion in interpreting the basic disability definition to include a light-duty limitation.

### B.     Light-Duty Limitation as Basis to End Benefits.

There is no evidence that Plaintiff was ever released for work by her own physician or based on any review by an independent medical examiner or other qualified professional. Thus, the "light-duty" provisions which could have ended Plaintiff's entitlement to benefits (or at least have properly characterized their continuation as being based solely on a mental health disability) never came into play.

Defendant also failed to expressly raise this limitation as a basis for denial until the final denial letter.[26] This failure also precludes reliance on this provision because it denied Plaintiff a full and fair opportunity to address the application of this limitation.

### C.     Basis of Disability During First Thirty Months.

The evidence establishes and the Plan does not dispute that Plaintiff's initial disability was based on combined mental and physical impairments which precluded her from performing her regular occupation. Moreover, the Plan's experts agreed that Plaintiff's epilepsy, a concededly physical condition, prevented her from driving which was a requirement of her regular occupation. Thus, Plaintiff met the basic disability definition at the outset of the first thirty months of disability even if only her physical difficulties were considered.

---

[26]   As discussed below, this limitation on the duration of benefits is distinct from the requirement that Plaintiff establish that she satisfies the relevant disability definition which shifted from a "regular occupation" to an "any occupation" definition in the thirty-first month of disability. The latter was raised in the letter sent to Plaintiff in April 2004 warning her that her benefits were subject to termination in August 2004.

The Plan arguably could have had Plaintiff examined during the first thirty months of disability to determine whether she could return to light-duty work. More critically, it could have sought an evaluation to determine whether she could return to light-duty work *but for* her mental health problems. Had it done so, it might arguably have relied on the light-duty limitation to recharacterize Plaintiff's disability as a mental health disability during the thirty-month period which might, thereafter, have been a basis for limiting benefits to the thirty-month maximum for mental health disabilities. It did not do so and cannot, therefore, rely on the light-duty limitation to automatically terminate Plaintiff's disability benefits at the conclusion of the first thirty-months of disability.

**2. Disability After the First Thirty Months**

For the reasons discussed above, Defendant cannot rely on the automatic thirty-month limitation on benefits applicable when a disability is *initially* attributed to a mental health condition. Plan § 6.04(F). This does not, however, end the inquiry as Plaintiff was entitled to continued benefits *only* if she satisfied the disability definition applicable beyond the first thirty months and was not subject to any limitation on those benefits.

**A.     Disability Definition Applicable After Thirty Months.**

The disability definition applicable "beginning with the thirty-first month of Disability" requires Plaintiff to establish a "complete inability (whether physical and/or mental) to engage in *any* gainful occupation or employment with any employer for which the Employee is, as of his Disability Date, reasonably qualified by education, experience or training." Plan § 6.01. Through the August 2004 letter denying Plaintiff's claim for benefits, the Plan (through its TPA) advised Plaintiff that it did not believe she satisfied this definition. BDK 412-13. Thus, this basic requirement for entitlement to disability benefits beyond thirty months was not waived, at least at that time.

35

Moreover, it remains Plaintiff's burden to establish that she satisfies this definition.

While the Plan may not have expressly referenced the "any occupation" definition in its final denial letter, it was referenced in the letters to Drs. Eberling and Genut.   Moreover, the overlap between this definition and the light-duty limitation which was referenced in the final denial letter, suggests that the Plan may have relied on this definition, in combination with the mental health definition discussed below, in deciding that Plaintiff was not entitled to benefits after the first thirty months of combined disability benefits.[27]   Under these circumstances, and in light of the ultimate determination that the matter should be remanded, the court will not preclude reliance on this definition upon remand.

### B.    Mental Health Limitation.

Although the above-quoted definition of disability (applicable after the first thirty months of disability) suggests that mental health disabilities may be covered after thirty months, Plan § 6.04 provides that disability benefits will end:

> (F) [1] *After thirty months of Disability* (twenty-four months of Long-Term Disability payments) for any Disability that is initially attributable to a Mental Health . . . *Disability*, and even if a non-Mental Health . . . Disability diagnosis should develop during the twenty-four month Long-Term Disability period. [2] *For a Disabled Participant with a Disability originally based on a non-Mental Health . . . Disability Diagnosis*, *said Long Term Disability benefits shall cease immediately upon the classification of the Disability as a Mental Health . . . Disability.*

**First Clause Not Applicable.**  For the reasons set forth in the preceding section, the court finds that the first clause (marked by a "[1]" in the quotation above) is not applicable here.  That is, although Plan representatives viewed Plaintiff's initial disability as being based on a mental health

---

[27] As noted in the preceding section, the "any occupation" definition is the basic requirement for an award of benefits after thirty months.  It is, therefore, distinct from and not dependent on the "light-duty" limitation found in Plan § 6.04(L) with its stated requirement for a "release" from a health professional.

disability, they did so based on an erroneous reading of the Plan language.  Plaintiff's disability was more correctly characterized as a physical disability at the outset and was not, during the relevant period, recharacterized based on a light-duty limitation.  *See supra* Conclusions of Law § 1.  The Plan cannot, therefore, rely on the first clause.

This leaves the second clause (marked by a "[2]" in the quoted limitation) which allows the Plan to terminate benefits after thirty months "immediately upon the classification of the Disability as a Mental Health . . . Disability."  *Id.*  This is, effectively, what occurred when the Plan advised Plaintiff that it intended to terminate her benefits after thirty months based on the limitation applicable to mental health disabilities.

The question, then, becomes whether the Plan acted properly in deciding that, to the extent Plaintiff remained disabled after thirty months of combined disability payments, her disability was a mental health disability.  This required the Plan to apply both the "any occupation" definition of disability applicable after the first thirty months of combined disability benefits and the Plan's definition of mental health disability.

It is critical here that the Plan includes a very specific and limited definition of mental health disability.  That definition refers to a specified range of ICD-9-CM diagnosis codes.  *See* Plan § 2.23 (defining mental health and substance abuse disability to include "any mental or psychological disorder with a primary diagnosis in the [ICD-9-CM] range of 290 to 319").[28]

---

[28]  The court rejects the Plan's argument that the definition should not be considered here because Plaintiff did not raise concerns as to this specific issue during the Plan review process.  Such an argument cannot be squared with ERISA's requirement that the court look first to the Plan language.  It is, moreover, clear that the Plan's decision was based on this specific definition, given its reliance on the mental health limitation and the Plan's definition of a mental health disability.  Moreover, the relevant definition was referenced in the letters sent to Drs. Eberling and Genut.  Thus, there is no unfair surprise in applying this definition here.

It is not, however, clear what definition was applied by the Plan during the administrative review process. The early documents do not refer to the limited range of diagnosis codes and suggest a generic definition of mental health disability was applied. The Plan did, on the other hand, expressly refer to the relevant ICD-9-CM code range when it wrote to Drs. Eberling and Genut seeking their opinions. Unfortunately, the reports from these physicians do not reveal whether they applied the Plan's mental health disability definition in rendering their opinions.

On the other hand, the opinions these two physicians did offer do not rule out the possibility that they did consider the codes listed in the letter seeking their opinions in deciding where to draw the line between "mental" and other medical problems. Even if they did not do so, what is stated in their opinions, coupled with the available evidence, leaves open whether they would reach the same conclusion if the definitions were properly applied and all evidence considered: that is, if they were asked whether Plaintiff was, as of the relevant time, unable to perform any occupation if they considered only her (properly defined) mental health difficulties.

Given the rulings above, the proper point in time to consider Plaintiff's disability status (and contributing causes) is no earlier than the date the Plan wrote Plaintiff advising her of its intent to terminate benefits based on the mental health limitation (arguably the date the disability was "reclassified"), and no later than the beginning of the thirty-first month of disability when benefits were terminated.

Looking to the evidence relevant to this period, it is apparent that Plaintiff had both mental and physical difficulties, both of which were documented in the medical records, though not always denominated by diagnosis code. It further appears that when the Plan's narrow definition of mental health disability is applied, the degree of Plaintiff's difficulties flowing from "mental health" diagnoses may be less extensive than the Plan has previously assumed. It is not, however, clear

38

where the line would be drawn and, most critically, whether Plaintiff, without consideration of her properly defined mental health problems, could satisfy the "any occupation" definition as of the thirty-first month of her disability.

The proper classification of Plaintiff's then-present diagnoses, and the extent to which each was disabling at the relevant time, requires a level of expertise and application of discretionary review which is more properly assigned to the Plan in the first instance. The court, therefore, concludes that the proper course is to remand the matter to the Plan under procedures set forth below.

**3.    Effect of Social Security Determination**

The determination of the Social Security Administration ("SSA") is not, as a legal matter, determinative in an ERISA action. *See generally Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831-32 (2003) (declining to extend treating physician rule applicable in Social Security cases to ERISA actions based on the "critical differences" between the Social Security disability program and ERISA benefits plans); *Smith v. Continental Cas. Co.,* 369 F.3d 412, 419 (4th Cir. 2004) (finding district court erred in relying on Social Security determination relating to the degree of Plaintiff's pain because "what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan"). In the present case, the SSA decision is of particularly limited value because the SSA clearly took into consideration Plaintiff's mental as well as physical difficulties, while only the latter are relevant here. Moreover, the absence of the full record considered by the SSA precludes fair comparison or consideration.

**4.    Physical Cause of Mental Difficulties**

In presenting her final appeal to the Plan, and in some arguments here, Plaintiff focuses on the possible physical causes of her difficulties, even if otherwise classified as mental health problems

under the Plan definition.  This argument cannot prevail given the definition of mental health which encompasses "any mental or psychological disorder with a primary [ICD-9-CM] diagnosis in the range of 290 to 319," and further provides:

> Such mental disorders include organic psychotic conditions and other psychoses, neurotic disorders, personality disorders and other non-psychotic mental disorders, *regardless of underlying cause for such disorder, whether such underlying cause is mental health, substance abuse, organic, physical or medical in origin.*

Plan § 2.23 (emphasis added).  In short, the proper diagnosis is determinative and the underlying cause irrelevant based on the plain language of the controlling Plan definition.

**5.    Remand**.

In light of the above, the court concludes that the Plan abused its discretion in denying Plaintiff's claim for benefits.  The errors do not, however, appear to have been based on any improper intent.[29]  In any event, it remains unclear whether Plaintiff was entitled to benefits at the conclusion of the first thirty months of benefits or remains entitled to benefits at this time.

The court, therefore, concludes that the proper course is to remand the matter for further consideration.  On remand, the following procedures will be applied:

1.    Within thirty days of entry of this order, Plaintiff may submit any additional materials which she desires the Plan to consider including any materials or summary she desires be presented to Defendant's experts.  During that same period, the Plan may obtain an independent medical evaluation of Plaintiff should it desire to do so.

---

[29]  It is significant here that Plaintiff's initial claim was denied by a TPA which lacked a direct financial interest in the matter, and that the initial denial was reversed by the Plan based on only minimal submissions by Plaintiff.  It is also significant that the Plan allowed Plaintiff an additional untimely appeal, after her appeals were otherwise concluded and upon the appearance of counsel.  During the final appeal, the Plan presented the issue to two independent experts whose advice the Plan followed in its ultimate denial decision.  While the court has found errors in the process and in Plan interpretation, it finds no evidence of bad faith or improper intent.

2.      At the conclusion of the thirty-day period, the Plan shall submit the matter to its two previously consulted experts, seeking their opinion as to the extent of Plaintiff's disabilities if only those conditions falling outside the listed mental health diagnosis codes are considered.   The Plan is encouraged, though not required, to also seek the input of a psychiatric expert.  If an independent medical examination has been obtained, that report shall also be provided to the experts.

3.      Within sixty days of entry of this order, Defendant shall provide Plaintiff with a copy of the expert reports and shall allow her two weeks to provide any comments to the appellate panel.

4.      Absent agreement to the contrary (which shall be filed with the court), Defendant shall render a final decision within ninety days of entry of this order.  That decision shall be filed with the court.

5.      This matter shall be held open on the docket pending receipt of the decision listed above. Within fifteen days of filing of the decision, the parties may file supplemental cross memoranda addressing the final decision.

        IT IS SO ORDERED.

                                                          s/ Cameron McGowan Currie
                                                          CAMERON MCGOWAN CURRIE
                                                          UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 27, 2007

C:\temp\notesB0AA3C\~3099119.wpd