IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Lisa Champion, | ) | C/A No.: 0:06-1548-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | POST REMAND |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| Black & Decker (U.S.) Inc., | ) | FINDINGS OF FACT |
| The Black & Decker Disability Plan, | ) | AND |
| and The Black & Decker Life Insurance | ) | CONCLUSIONS OF LAW |
| Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action, Plaintiff Lisa Champion ("Champion") seeks a determination that Defendant The Black & Decker Disability Plan ("Plan"), abused its discretion when it discontinued Champion's long-term disability ("LTD") benefits. The Plan is an employee welfare benefit plan as that term is defined by ERISA, 29 U.S.C. § 1132(d)(1), *et seq.* Champion's claims are, therefore, pursued solely under 29 U.S.C. § 1132(a)(1)(B) and (g).

As discussed in the opinion and order entered on March 28, 2007, Champion's benefits were discontinued based, primarily, on a limitation on the duration of benefits available for "mental health" disabilities. *See* Dkt No. 34 ("First Opinion and Order"). The court found errors in the process which led to the discontinuation of benefits including, most critically, an impermissible interpretation of the Plan language and a failure to adequately address the Plan's definition of mental health disability. In light of these errors, the court concluded that the Plan abused its discretion in denying Champion's claim. The court did not, however, find that the errors resulted either from bad faith or any other improper motivation. Neither did the court find the record so clear as to require an award of benefits.

In light of these determinations, the court remanded the matter for further consideration by the Plan. That review, for which the court provided certain guidelines, concluded with the Plan again denying Champion's claim for benefits. The matter is now before the court for final resolution on supplemental written submissions. For the reasons set forth in the First Opinion and Order and below, the court upholds the Plan's decision.

## ISSUES ON REMAND

On remand, the Plan was directed to consider "whether Champion, without consideration of her properly defined mental health problems, could satisfy the 'any occupation' definition as of the thirty-first month of her disability." Dkt No. 34 at 39. This inquiry has two subparts: (1) whether any of Champion's allegedly disabling conditions (but, most particularly, her pseudoseizures) fall within the mental health definition; and (2) whether Champion would have satisfied the "any occupation" disability definition as of her thirty-first month of disability if all mental health conditions were excluded from consideration.

## APPLICABLE LAW AND STANDARD OF REVIEW

For reasons set forth in the First Opinion and Order, the Plan's decision is reviewed under the unmodified abuse of discretion standard of review. Under this standard of review, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)). *See also Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001) (listing numerous factors to be considered in deciding reasonableness).

2

**DECISION OF THE COURT**

Having fully considered the supplemental submissions of the parties, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.  In addition to the facts set forth below, the findings of fact set forth in the First Opinion and Order are incorporated herein by reference.

**FINDINGS OF FACT**

**A.    RELEVANT PLAN TERMS**

The following Plan terms are relevant to the issues left open by the First Opinion and Order.

> Section 6.01.  Disability –. . .  "Disability" shall mean . . . beginning with the thirty-first month of Disability, the Participant's complete inability (whether physical and /or mental) to engage in any gainful occupation or employment with any employer for which the Employee is, as of his Disability Date, reasonably qualified by education, experience or training. . . .

BDK 8 (Plan § 6.01).

> Section 6.04.  Termination of Disability Benefits – Once commenced under Section 6.03, Disability Benefits shall continue until . . . :
> * * *
> (F) After thirty months of Disability . . . . Long Term Disability benefits shall cease immediately upon the classification of the Disability as a Mental Health . . . Disability.

BDK 10-13 (Plan § 6.04).

> Section 2.23.  A Mental Health or Substance Abuse Disability shall mean *any mental or psychological disorder with a primary diagnosis in the range of 290 to 319* under the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM) . . . . Such mental disorders include organic psychotic conditions and other psychoses, neurotic disorders, personality disorders and other non-psychotic mental disorders, *regardless of underlying cause* . . . , whether such underlying cause is mental health, substance abuse, organic physical or medical in origin.

BDK 4 (Plan § 2.23–emphasis added).

3

**B.     HISTORY OF THE CLAIM AND MEDICAL EVIDENCE**

The history of the claim and medical evidence is set forth in detail in the First Opinion and Order. A summary of those facts most relevant to the present decision are repeated below.

**Selected Medical History Considered in First Opinion and Order.** Champion was diagnosed with a "complex partial seizure disorder" in 1999 based, in part, on hospital studies showing "epileptiform activity in the left temporal region." *See* BDK 629. Medical records suggest that Champion's actual epileptic seizures were of the *petite mal* or "absence" variety. *See, e.g.,* BDK 622-29. Three treating physicians noted that Champion also reported seizure-like events which were not epileptic seizures. BDK 340, 343, & 623. These events were sometimes characterized by the physicians as psuedoseizures and sometimes as panic attacks. BDK 340 & 343. Champion was also diagnosed with various emotional or psychiatric conditions including: anxiety, depression, panic attacks, and post-traumatic stress disorder. *E.g.,* BDK 345-47 & 349-53.

At least into 2000, Champion's seizures were well controlled with medication. Prior to Champion's last day at work in January 2002, her only medical restrictions were restrictions from driving, operating dangerous machinery or climbing ladders. BDK 628 & 630.

In May 2002, during the earlier months of Champion's disability status, her neurologist, Dr. Gettlefinger, wrote a letter "To Whom it May Concern," in which he described Champion as suffering from "uncontrolled epilepsy." *See* BDK 375. In March 2004, however, he advised another of Champion's treating physicians that Champion was "continu[ing] to have spells, the dilemma is which of them are epilepsy and which of them are *pseudoseizures related to anxiety and depression*." BDK 538.

Further, although some medical records assign a non-mental health code to Champion's

4

pseudoseizures, other records suggest psychological causes. *Compare* BDK 617 (April 12, 2002 report from the Medical College of Georgia ("MCGA")[1] diagnosing "(1) Epilepsy, partial with impairment of consciousness, intractable (345.41) and (2) non-epileptic events (pseudoseizure, 780.39)");[2] *with* BDK 446 (Dr. Gettlefinger's September 5, 2002 letter referring Champion for a psychiatric consultation and stating: "It is recommended by the epilepsy clinic [at MCGA] in August that she have psychiatric follow up.") *and* BDK 538 (quoted *supra*). The medical evidence also suggests that Champion's more frequent and more severe seizure-like events were, in fact, pseudoseizures, while her true epiletic events were of the "absence" or *petit mal* variety. *See* BDK 617 (MCGA report ).

During the first year of Champion's disability, the Plan received a letter from Brenda L. Eshbach, MA, LPC, addressing Champion's mental health status. BDK 402-03. This letter explained that Eshbach had seen Champion four times between May and June of 2002. She repeated Champion's self-reports of an emotionally and physically abusive history, seizures ("seemingly from head trauma during physical abuse"), pseudoseizures, panic attacks, and a "'nervous breakdown' in 1984/85.'" Eshbach did not expressly address whether Champion's pseudoseizures would be considered a mental health issue and did not provide a specific diagnosis code, however, her area of expertise would suggest she viewed the pseudoseizures as a mental health concern. Eshbach concluded by stating that Champion had:

---

[1] This entity was incorrectly designated as the Medical *University* of Georgia in the First Opinion and Order.

[2] The contemporaneous records do not, in all cases, assign a diagnosis code to the pseudoseizures. To the extent they do assign a code, it is 780.39 which does not fall within the codes covered by the Plan's "mental health" definition (covering ICD-9-CM code range 290-319).

5

> recently had more of these episodes at work. One of her recent pseudo-seizures was Sunday, May 12, 2002. It took ab[out] a day of rest to recover. Oftentimes it takes longer. Her most recent symptoms are unpredictable seizures and pseudo-seizures, depression (crying spells, loss of interest in things previously enjoyed, difficulty concentrating, grief [about] loss of ability to function and hold a job).

BDK 403.

After an initial denial, the Plan approved Champion's disability claim. Benefits were paid continuously through the thirtieth month of benefits (ending in August 2004). BDK 275 & 410-414. In April 2004, however, the Plan informed Champion that it was evaluating whether her benefits should continue past the thirtieth month (August 2004) of disability. *See* BDK 411. The Plan asked Champion to provide or release her medical records. It also asked her to complete a Disability Questionnaire. *Id.*[3]

The Plan's concluded that Champion was not entitled to continued benefits beyond the first thirty months of disability. BDK 412-13 (August 30, 2004 denial letter). The denial was based on two grounds: (1) Champion's failure to establish an inability "to perform your occupation or any occupation"; and (2) the thirty month limit on benefits for "a psychiatric illness." BDK 412-13. The Plan relied, in part, on Dr. Gettlefinger's March 2004 statement that he was unable to determine "which of [Champion's continuing spells] are epilepsy and which of them are pseudo[-]seizures related to anxiety and depression." BDK 412. The Plan also noted that records from Champion's psychiatrist, Hayne D. McMeekin, M.D., and therapist, Faith Northington, indicated that Champion

---

[3] In her response to this questionnaire, Champion explained that she could not work because "Pressures and tension of the job causes increase[d] seizures-loss of memory-problem with my speech [and] recall-already causing me problems in functioning independently. Any more and I can lose the little bite [sic] of freedom I do have. I went to college and that information is being lost." BDK 532. She listed both "depression" and "seizures" as her disabling conditions but also stated that she drives within a 5 mile radius of home. *Id.*

6

was being treated for anxiety and panic attacks. *Id.*

Champion responded by handwritten letter dated September 25, 2004. BDK 415-420. This letter addressed Champion's abusive past, which she suggested may have caused some of her difficulties, and the difficulties she experienced during the last two years of her employment, particularly a "seizure" which led to her transport to the hospital. She conceded that her "grand malls [sic] have [stopped]."[4] Focusing on her desire to work, she stated: I'm not trying to avoid work. *I just can't handle the stress and pressure of the environment anymore.* I have to pay a high price mentally and physically." BDK 417 (emphasis added). Champion also described her "different types of seizures" as including "smelling of burning flesh and a gross rhythm being chanted. I can hear it when I'm alone or it comes through the voices of people in conversation." BDK 418. She explained that when she is experiencing these problems, she "need[s] someone to talk [her] down," and that having paper to hold sometimes calms her. BDK 417-18.

Champion's letter was treated as an appeal which was, ultimately, denied. Another, belated appeal was also allowed after Champion retained counsel. That appeal was also denied. *See* Dkt No. 34 at 19-22. The present action followed.

Records submitted in the course of the second appeal include correspondence between Dr. Gettlefinger and Dr. McMeekin, Champion's treating psychiatrist, discussing the psychological aspects of Champion's difficulties. In a June 2003 letter, Dr. McMeekin noted that Champion "appears to have a secondary structural affective disorder" causing her to be" unable to focus and concentrate." BDK 510 (also referring to a "bipolar component" of this affective disorder). He concluded that, in addition to the problem with seizure control, they needed to deal with difficulties

---

[4] There are no medical records which diagnose Champion as suffering from grand mal epileptic seizures. What she describes as grand mal seizures would, therefore, most likely be pseudoseizures.

7

which "make[] all her psychiatric symptoms come about." *Id.* (emphasis added). Dr. Gettlefinger responded on June 23, 2003, agreeing to a medication change and conceding that Champion's "seizures are at least in part pseudoseizures related to stress." BDK 541.

Other correspondence from Dr. Gettlefinger during this period suggests an inability to determine the degree to which Champion's difficulties are related to epilepsy and the degree to which they are pseudoseizures caused by stress, anxiety or depression. *See* BDK 538 (March 12, 2004 letter quoted *supra*); BDK 542 (June 16, 2003 letter to Champion's primary physician referring to Champion's "significant psychological issues").

Dr. McMeekin's records confirm that Champion was being treated for depression and panic attacks during the spring of 2004. BDK 555-58. Records from both McMeekin and Gettlefinger indicate Champion was experiencing relatively few seizures, but was still dealing with psychiatric difficulties. *Id.*, BDK 561 (November 24, 2003 report from McMeekin's practice indicating Champion had gone "months [without] seizures" but was still dealing with depression); BDK 542 (June 2003 letter quoted above, also indicating Champion had experienced "some bad seizures" recently but that these were likely due to noncompliance with her medications).

To the extent Champion reported seizures, they appear to have been pseudoseizures given that she described them as "grand mal." BDK 565 (McMeekin record of March 6, 2003 visit in which Champion reported recent "grand mal" seizure). Champion's more frequent reports were, however, of "spells" and "panic attacks." BDK 566 (McMeekin record of January 20, 2003 visit in which Champion reported "no seizures that she knows about" but has had "spells . . . and panic attack"). Numerous reports from Champion's psychological counselor in 2004 indicate Champion was suffering from stress-induced panic attacks in addition to possible stress-induced "seizures."

8

*See* BDK 568-70 ( August 11, 2004 report from Northington indicating Champion reported: "severe memory problems"; "occasional panic attacks when experiencing undue stress"; "any physical or mental strain for prolonged period induces seizures" – diagnosing dysthymia, panic disorder and PTSD); BDK 572-73 (Northington reports from June and July of 2004 reflecting Champion's self-reports of seizures including several described as grand mal seizures); BDK 574 (Northington records from April and May 2004 reflecting Champion's self-reports of "panic attacks or seizures"); BDK 575-76 (Northington records from February through March 2004 referring to Champion's memory problems, panic attacks and PTSD symptoms).

**First external expert review by Plan**. As part of the appeal process, the Plan sought input from two outside medical experts: James G. Ebeling, M.D., an internist, and A. Allan Genut, M.D., a neurologist. The Plan asked both to conduct independent medical reviews of Champion's file. Both concluded that Champion did not satisfy the disability definition applicable after the first thirty months of disability. *See* Dkt No. 34 at 28-30 (discussing initial review by Drs. Ebeling and Genut).

Only Dr. Ebeling expressly addressed the impact of Champion's mental health difficulties. Dr. Genut did, however, expressly *exclude* mental health difficulties from consideration in reaching his opinion that Champion was not "physically" disabled. Unfortunately, neither doctor provided any reference to diagnosis codes in explaining his opinion. Thus, it was not clear from either opinion whether they had properly considered the Plan's limited definition of mental health disability.

## C.   FIRST OPINION AND ORDER

In its First Opinion and Order, that the court found that the Plan made procedural errors in its processing of Champion's claim. Rather than directing an award of benefits, the court remanded the matter for further consideration by the Plan. In reaching this decision, the court noted: "The

9

proper classification of Champion's then-present diagnoses, and the extent to which each was disabling at the relevant time, requires a level of expertise and application of discretionary review which is more properly assigned to the Plan in the first instance." Dkt No. 34 at 39.

### D.     POST-REMAND PLAN REVIEW

**Champion's Submissions on Remand.**  On remand, Champion was given an opportunity to submit additional materials to the Plan. On April 27, 2007, she submitted two articles addressing difficulties facing individuals with "intractable epilepsy," as well as an index to the ICD-9-CM diagnosis codes. The articles support the conclusion that many individuals with intractable epilepsy suffer from various symptoms and difficulties which include those claimed by Champion.

The index of ICD-9-CM codes includes two separate codes for pseudoseizures: 300.11 and 780.39. The 300.11 code indicates a psychiatric pseudoseizure. The 780.39 code indicates a non-psychiatric pseudoseizure.

On May 3, 2007, Champion submitted two additional exhibits: a letter from Howard Mandell, M.D., a neurologist, and Dr. Mandell's curriculum vitae. In his letter, Dr. Mandell states that he is president of the practice of which Dr. Gettlefinger was a member until his retirement. He states that Champion continues as a patient of the practice, and that he has reviewed her chart.

Although Dr. Mandell does not assert that he is one of Champion's treating physicians, he does state that he concurs with Dr. Gettlefinger's conclusion that Champion has not "been capable of consistently working in any occupation since May 30, 2002." BDK 703. He also states that Champion has "intractable epilepsy (ICD-9 Code 345.41) and pseudoseizures (ICD-9 Code 780.39)." He further explains:

> Epilepsy is a neurological disorder characterized by spontaneous, recurring seizures. "Intractable" means that her epilepsy is not responsive to currently-known

10

> medications. As for the pseudoseizures, this is a medical term for non-psychiatric convulsions.

BDK 703.

Dr. Mandell proceeds to discuss the symptoms of Champion's "seizure disorder," without distinguishing between those symptoms caused by epilepsy and those caused by pseudoseizures. He also addresses the side effects of her medications, concluding as follows:

> Given Champion's symptoms, her taking of the above prescribed drugs to suppress said symptoms, and the unpredictability of her attacks, she cannot operate machinery, drive a vehicle, work at heights, balance, climb, be subjected to extreme changes in temperature, exposure to dust, exposure to chemicals, exposure to extreme noise, exposure to extreme fumes, vibrations, or other items which might trigger a seizure. Nor can she consistently maintain concentration, relate predictably in social situations, behave in an emotionally stable manner, or be expected to follow instructions given her history of intractable seizures. [Her] condition impairs her memory and concentration, as well as her ability to organize thoughts. In sum, her seizures and pseudoseizures prevent her from attending work on a regular basis and being a reliable consistent employee.
>
> As a result, to a reasonable degree of medical certainty, it is my opinion that Lisa Champion does not currently have the ability to engage in any occupation.

BDK 704.

**Letter from Counsel.** Champion also submitted a letter from counsel which summarized selected portions of the administrative record including: a March 2002 response to an FMLA questionnaire by Champion's treating physician, Dr. Hanrahan; a September 2002 office note and a rather conclusory February 2004 letter from Dr. Gettlefinger; and the more recent statement from Dr. Mandell. The letter also challenges the Plan's reliance on Drs. Ebeling and Genut based on their alleged lack of independence (due to their being "within Black & Decker's sphere of influence"). Counsel does not, however, offer any specific challenge to the content of their supplemental opinions (discussed below).

**Supplemental Review By Genut and Ebeling.** The Plan requested and received

11

supplemental opinions from Drs. Genut and Ebeling. Both concluded that Champion's pseudoseizures were properly designated under the 300.11 code and that, as a result, Champion did not satisfy the relevant disability definition.

**Dr. Genut's Report.** Dr. Genut, a neurologist, provided a short report stating that Champion's pseudoseizure diagnosis in September 2004 was a "300.11" diagnosis rather than a 780.39 diagnosis. He further stated that the latter diagnosis: "is a catch all intended to be used primarily when the seizure type is unclear or undefined. This is not the case with Ms. Champion whose seizures and pseudoseizures are well defined and can be characterized by specific . . . ICD-9 codes." BDK 713. Dr. Genut also opined that "no work restrictions are necessary in patients with pseudoseizures" and that Champion "is fit for employment at any job, by any employer" provided she is restricted from driving an automobile, operating heavy machinery or working at unprotected heights.

**Dr. Ebeling's Report.** Dr. Ebeling, an internist, provided a far more detailed report. BDK 714-17. He first addressed whether Champion was, as of September 4, 2002, capable of "engag[ing] in any occupation for which she is reasonably qualified . . . *considering only conditions falling outside of . . . ICD-9-CM codes 290-319.*" *Id.* (emphasis added). He began by listing Champion's various diagnoses falling outside of this range, noting that only her "complex partial seizure disorder" (345.40–epilepsy) is alleged to cause disability and that it requires only limited restrictions. BDK 714. This conclusion was supported by reference to various medical records indicating that Champion "has, at times, had long periods of time between seizures of any type." BDK 715. Dr. Ebeling specifically referenced Dr. Gettlefinger's December 2003 statement that Champion reported having no seizures since June of that year, a similar notation from Champion's

counselor (Northington) around the same time, and notations by several other providers from somewhat earlier periods of time. Dr. Ebeling also noted that a seizure Champion suffered in May 2003, was her first in three months and occurred after a week of non-compliance with her medications.

Based on the evidence that Champion suffered few actual epileptic seizures, and the related evidence that at least some of these seizures followed non-compliance with medications, Dr. Ebeling concluded that the evidence "does not support attempts to characterize Ms. Champion's seizure disorder as "intractable." He further opined that Champion's epileptic "seizures are relatively infrequent, not intractable, and would not preclude her from any occupation which does not require her to operate machinery or work at unprotected heights." BDK 715.

Dr. Ebeling stated that he did not include Champion's pseudoseizures in the above analysis because he did not believe they fell within the 780.39 diagnosis code. He explained his reasoning on this critical point briefly in the first section[5] and in more detail in the second stating:

> Based on the descriptions of [Champion's] true complex partial seizure and her pseudoseizures by the [Medical College of Georgia] Neurologists interpreting her video-EEG monitoring, it appears to me, as I read Ms. Champion's letters, that she is more disturbed and impaired by her pseudoseizures (which she describes as "grand malls" [sic]) than by her genuine complex partial seizures.
>
> As regards classification of Ms. Champion's pseudoseizures as psychiatric under code 300.11, I refer to Neurologist Dr. Gettlefinger's note from 3/12/04: "the dilemma is which of them are epilepsy and which of them are pseudoseizures related to anxiety and depression." Furthermore, Ms. Champion's history of abuse is consistent with the diagnosis of psychogenic pseudoseizures: "frequent anecdotal reports in the literature suggest that sexual abuse plays an etiologic role in

---

[5] In the first section, Dr. Ebeling stated: "Codes 780-799 refer to 'symptoms signs and ill-defined conditions'; 780.39 is a very general code for poorly defined spells which cannot be further characterized. I believe Ms. Champion's pseudoseizures clearly fall into 300.11 (pseudoseizure, psychiatric) code, and I will defend this contention below in Section II." BDK 714.

13

> psychogenic seizures, especially in female patients." (Elaine Wyllie, M.D., The Treatment of Epilepsy, 3rd edition, 2001, p. 701). Given her numerous psychiatric diagnoses listed above, I believe that Ms. Champion's pseudoseizures are clearly of psychiatric origin.

BDK 716.

Dr. Ebeling also noted Champion's own statement in September 2004 that she is "not trying to avoid work" but "can't handle the stress and pressure of the environment anymore," as well as the August 2004 notes of her counselor who noted Champion's difficulties with: "decreased sleep and appetite, problems with concentration, focus, and memory, flashbacks, and seizures." BDK 717. He concluded that, Champion "may be disabled on the basis of [her] multiple mental health disorders," although he did not believe she would be disabled from "any occupation" if the mental health disorders were excluded. *Id.*[6]

**Decision on Remand.** On July 2, 2007, the Plan issued its decision on remand, reaffirming its earlier denial but based solely on the thirty-month limitation for mental health disabilities.[7] In reaching this decision, the Plan treated pseudoseizures as a mental health condition, thus excluding that condition from consideration for purposes of determining if Champion was disabled by non-mental health conditions. It did so based on the opinions of Ebeling and Genut that Champion's pseudoseizures should be assigned the 300.11 ICD-9 CM code because they were not "ill-defined or physical in nature," but, instead, had apparent psychological causes. The Plan also noted, as had

---

[6] Champion's multiple mental health disorders were listed on the third page of Dr. Ebeling's report and included: depression (311), dysthymic disorder (300.4), panic disorder (300.01), post traumatic stress disorder (309.81), and pseudoseizures (to which Dr. Ebeling assigned a code of 300.11). All fall within the Plan's definition of mental health disorders if Dr. Ebeling's coding of Champion's pseudoseizures is accepted.

[7] The Plan conceded that Champion may have met the "any occupation" disability definition in September 2004 if her mental health conditions were considered.

14

Dr. Ebeling, that Champion's "primary treating physician characterized her pseudoseizures as being related to anxiety and depression." BDK 719.

## CONCLUSIONS OF LAW

In light of the Plan's reliance solely on the mental health limitation, the critical questions before the court are (1) whether the Plan acted within its discretion in characterizing Champion's pseudoseizures as a mental health condition (that is, as falling within the 300.11 code); and (2) whether the Plan acted within its discretion in concluding that Champion did not satisfy the "any occupation" definition of disability as of September 2004, absent consideration of her pseudoseizures and other, properly defined, mental health conditions. For the reasons set forth below, the court answers both questions in the affirmative.

### A.     CHARACTERIZATION OF PSEUDOSEIZURES AS PSYCHIATRIC

Three consulting physicians have offered opinions on the proper characterization of Champion's pseudoseizures. These include Drs. Mandell, Genut, and Ebeling. For the reasons discussed below, only Dr. Ebeling's opinion is helpful to either party.

**Dr. Mandell.** For a variety of reasons, Dr. Mandell's opinion is not so persuasive as to require the Plan to accept it as determinative. First, Dr. Mandell did not purport to have examined Champion at any time, much less in the spring through fall of 2004 which is the critical time frame. Instead, he based his opinion on a review of Champion's chart, expressing agreement with Dr. Gettlefinger's opinion that Champion was totally disabled from any occupation. Thus, Dr. Mandell's opinion is essentially that of a consulting physician (much like Drs. Genut and Ebeling), rather than a treating physician. In any case, he adds little to Dr. Gettlefinger's prior opinions as to the degree and nature of Champion's disability.

Specifically as to the nature of Champion's pseudoseizures, Dr. Mandell's opinion may reasonably be interpreted as conflicting with Dr. Gettlefinger's contemporaneous statements which referred to Champion's pseudoseizures as being caused by stress, anxiety, and depression. Nothing in Dr. Mandell's opinion explains why he concluded, despite Dr. Gettlefinger's earlier characterization of Champion's condition, that the non-psychiatric code for pseudoseizures should be used, rather than the psychiatric code. Instead, he stated flatly that the term "pseudoseizure . . .is a medical term for non-psychiatric convulsions." This statement is contradicted by the ICD-9-CM index which Champion submitted and which includes two distinct codes for the same term: one for psychiatric (300.11) and one for non-psychiatric (780.39) pseudoseizures.

Dr. Mandell, like Dr. Gettlefinger, made no attempt to distinguish between Champion's epileptic seizures and pseudoseizures in offering his opinion as to the degree of her disability. Consequently, Dr. Mandell's opinion is of no assistance to Champion if one rejects the conclusion that Champion's pseudoseizures are non-psychiatric. Neither did Dr. Mandell indicate the extent to which he considered Champion's various other psychiatric difficulties in forming his opinion as to the degree of her disability. Thus, Dr. Mandell's opinion sheds no light on the second critical issue: the degree to which Champion was disabled by non-mental health conditions as of September 2004.

**Dr. Genut.** Dr. Genut's post-remand report is no more helpful than Dr. Mandell's. He stated flatly that Champion had a diagnosis of "Pseudoseizures (ICD-9-CM 300.11)" in September 2004. He did not, however, point to any evidence that any treating physician applied such a code to Champion's pseudoseizures during the relevant time frame.

16

Neither did Dr. Genut address the fact that those treating physicians who did assign a code to Plaintiff's pseudoseizures used the 780.39 code. Dr. Genut also failed to explain why the psychiatric pseudoseizure code is the more appropriate, offering only a conclusory statement that Champion's "seizures and pseudoseizures are well defined and can be characterized by specific (rather than non-specific) ICD-9 codes."

Under these circumstances, Dr. Genut's May 26, 2007 opinion as to the proper classification of Champion's pseudoseizures carries little if any weight. His opinion that Champion is fit for any work with any employer subject to limited restrictions is also questionable as it seems to include consideration of all of her present conditions, most critically her pseudoseizures.[8] The Plan did not, in any event, rely on Dr. Genut's conclusion that Champion was not disabled if all of her conditions (mental health and non-mental health) were considered.

**Dr. Ebeling**. As discussed above, Dr. Ebeling provided a full and persuasive explanation of his reasons for characterizing Champion's pseudoseizures as psychiatric in origin. Most critically, he referred to Dr. Gettlefinger's contemporaneous characterization of the cause of the pseudoseizures as being related to other mental health causes (anxiety and depression). He also: noted Champion's own statements which suggest her pseudoseizures were of psychological origin; supported his opinion as to the nature of the pseudoseizures with a specific reference to a medical text; and explained how his characterization of the pseudoseizures fit with Champion's significant psychiatric difficulties.

---

[8] Despite giving this opinion, Dr. Genut fails to expressly address the significant problems posed by Champion's various and well-supported psychiatric difficulties.

17

**Plan Conclusion.** In light of Dr. Ebeling's opinion and other substantial supporting evidence (most critically the contemporaneous records prepared by Champion's various treating medical providers),[9] it was not unreasonable for the Plan to conclude that Champion's pseudoseizures should be characterized as psychiatric in origin. This conclusion is also supported by Champion's September 25, 2004 letter in which she described her "seizures" in terms suggest a significant psychiatric component. *See supra* at 7 (quoting letter). Given this conclusion, it follows that the Plan acted within its discretion in determining that Champion's pseudoseizures came within the Plan's definition of a mental health condition.

## B.     DEGREE OF DISABILITY

Champion offers no argument that she can satisfy the "any occupation" standard if her pseudoseizures are excluded from consideration. Even were she to make such an argument, she could not prevail in showing that the Plan was unreasonable in concluding that she did not meet the relevant disability definition in September 2004, assuming her pseudoseizures are properly excluded from consideration. Most critically, although Drs. Gettlefinger and Mandell opined that Champion was totally disabled from any occupation by her "seizure disorder," neither suggested that she would be disabled if the pseudoseizures (or other psychiatric conditions) were not considered.

The conclusion that the Plan did not abuse its discretion in characterizing Champion's pseudoseizures as a "mental health" condition, therefore, leads to the conclusion that the Plan did not abuse its discretion in finding that Champion was not disabled by any non-mental health

---

[9] The contemporaneous treatment notes and correspondence of at least four of Champion's medical providers may reasonably be read to support the Plan's conclusion that Champion's pseudoseizures had a significant psychiatric component. These providers include her neurologist (Dr. Gettlefinger), her psychiatrist (Dr. McMeekin), and her two psychologists or counselors (Eshbach and Northington).

condition. In light of this conclusion, the court finds that the Plan did not abuse its discretion in discontinuing Champion's benefits after thirty months.

**C.     ATTORNEYS' FEES**

The court does not find any facts which would support an award of attorneys' fees in either party's favor. In this regard, the court notes that Champion was partially successful in that she obtained remand, but failed, ultimately, to obtain any substantive relief.

**CONCLUSION**

For the reasons set forth above, the court finds that Defendant did not abuse its discretion in discontinuing Champion's benefits after thirty months. Defendant is, therefore, entitled to judgment in its favor dismissing Champion's claims with prejudice. Neither party shall, however, be awarded fees.

IT IS SO ORDERED.

s/ Cameron McGowan Currie<br>CAMERON MCGOWAN CURRIE<br>UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
August 29, 2007